# EXHIBIT A

# <u>NOTICE</u>



You have been named as a defendant in a foreclosure action filed in the Mahoning County Court of Common Pleas.  The documents you have received are important legal documents. You have received a copy of the complaint which lists all the parties and briefly describes the action filed against you.  Also, you have received a summons which commands you to answer the complaint within 28 days.  An answer to a complaint is a written legal document which must be filed with the court and a copy mailed to all parties or their attorneys.  Failure to respond to a properly served complaint may result in the court entering a default judgment against you and may eventually result in the sale of your home/property at a sheriff's sale.

**PLEASE BE ADVISED THAT OHIO REVISED CODE PROHIBITS ANY PERSON SERVED WITH A SUMMONS FROM KNOWINGLY AND WITH PURPOSE TO DIMINISH THE VALUE OR ENJOYMENT OF THE RESIDENTIAL REAL PROPERTY IN THIS FORECLOSURE ACTION FROM MOVING, DEFACING, DAMAGING, DESTROYING OR OTHERWISE IMPROPERLY TAMPERING WITH PROPERTY THAT IS THE SUBJECT OF A FORECLOSURE.  SUCH ACTION MAY RESULT IN CRIMINAL PROSECUTION.**

Because of the seriousness of this action, you may want to speak to an attorney.  The Clerk of Court staff and other court staff cannot assist you in the preparation of legal documents.  If you do not have and attorney, you may want to contact **SAVE THE DREAM** at 1-888-404-4674 [toll-free].

**MICHAEL P. CICCONE**

**Mahoning County Clerk of Courts**

Court of Common Pleas, Mahoning County
120 Market Street
Youngstown, Ohio 44503

# S U M M O N S   ON   COMPLAINT

### Rule 4 Ohio Rules of Civil Procedure

------========*=========------

Case No. 2025 CV 01517

OHIO GAMBLING RECOVERY      -vs-        KALSHI INC.
LLC                                     594 BROADWAY RM 407
1700 S MACDILL AVE SUITE                NEW YORK, NY 10012
300
TAMPA, FL 33629

TO: **ROBINHOOD DERIVATIVES**    **85 WILLOW ROAD MENLO PARK**
**LLC**                          **MENLO PARK, CA 94025**
     Defendant

To the above named defendant(s):  (See attached complaint for additional parties)

You are hereby summoned that a complaint (a copy of which is hereto attached and made a part hereof) has been filed against you in this court by the plaintiff(s) named herein.

You are required to serve upon the plaintiff('s') attorney, or upon the plaintiff(s) if he/she/they has/have no attorney of record, a copy of your answer to the complaint within 28 days after service of this summons upon you, exclusive of the day of service.  Said answer must be filed with this court within three (3) days after service on plaintiff(s) attorney.

The name and address of the plaintiff('s') attorney is as follows:

BENJAMIN M FLOWERS
P.O. BOX 8248
CINCINNATI OH  45249

If you fail to appear and defend, judgment by default will be taken against you for the relief demanded in the complaint.

Michael P. Ciccone
Mahoning County Clerk of Courts

June 23, 2025

By: J smith
          Deputy Clerk

ELECTRONICALLY FILED
2025 Jun 11 PM 8:35
Michael P. Ciccone, CLERK OF COURT - MAHONING

## IN THE COURT OF COMMON PLEAS
## MAHONING COUNTY, OHIO

OHIO GAMBLING RECOVERY LLC,

    1700 S MACDILL AVE, SUITE 300,
    TAMPA, FL 33629

                *Plaintiff,*

    v.

KALSHI, INC.

    594 BROADWAY RM 407, NEW YORK
    CITY, NEW YORK 11012

KALSHIEX LLC

    594 BROADWAY RM 407, NEW YORK
    CITY, NEW YORK 11012

KALSHI KLEAR INC.

    594 BROADWAY RM 407, NEW YORK
    CITY, NEW YORK 11012

KALSHI KLEAR LLC

    594 BROADWAY RM 407, NEW YORK
    CITY, NEW YORK 11012

SUSQUEHANNA INTERNATIONAL
GROUP, LLP

    401 CITY AVENUE SUITE 220, BALA
    CYNWYD, PENNSYLVANIA 19004

SUSQUEHANNA GOVERNMENT
PRODUCTS, LLLP

    401 CITY AVENUE SUITE 220, BALA
    CYNWYD, PENNSYLVANIA 19004

**Complaint**

Case No. _25CV1517_

_JUDGE KRICHBAUM_
**Jury Demand Endorsed Hereon**

**2025 CV 01517**

ROBINHOOD MARKETS, INC.

   80 STATE STREET, ALBANY, NEW YORK 12207

ROBINHOOD DERIVATIVES, LLC

   85 WILLOW ROAD, MENLO PARK, CALIFORNIA 94025

WEBULL CORPORATION

   200 CARILLON PARKWAY STREET, ST. PETERSBURG, FLORIDA 33716

             *Defendants.*

## COMPLAINT

Plaintiff Ohio Gambling Recovery LLC brings this action against Kalshi Inc., KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, Kalshi Trading LLC, Susquehanna International Group LLP, Susquehanna Government Products, LLLP, Robinhood Markets, Inc., Robinhood Derivatives, LLC, and Webull Corporation (collectively, "Defendants") for recovery of gambling losses under R.C. 3763.04.

## INTRODUCTION

1.      Ohio ("the State") comprehensively regulates gambling-related activities within its borders. To protect its residents from predatory and financially destructive gambling enterprises, it has prescribed exacting civil and criminal penalties on all those who seek to evade those regulations. *See* R.C. ch. 2915. For most, the threat of those penalties is deterrence enough. But not for all. Lured by the wealth of the Ohio market, illegal, unregulated gambling companies have chosen to prey upon Ohio residents.

2

2.      Defendant Kalshi operates a "prediction market" accessible to the State's residents.   That prediction market permits the buying and selling of products called "event contracts."  While masquerading as novel securities offerings, these event contracts are in truth nothing more than illegal, unregulated wagers on the occurrence (or non-occurrence) of specific future events.  Using this prediction market, the State's residents can place bets on (among other things) the outcome of sports games, on the winner of political elections, and on the song that will be the most popular this summer.  These wagers do not differ materially—in form or function— from the offerings found in casinos, sportsbooks, and other traditional gambling establishments. Kalshi's prediction market violates both state and federal law.   And because Defendants Robinhood and Webull have partnered with Kalshi to offer its prediction market on their own platforms, their platforms violate state and federal law too.  Collectively, the State's residents regularly gamble (and lose) on each of these platforms.

3.      Prediction markets could not operate without the help of "market makers"— companies that provide liquidity by buying and selling event contracts.  Kalshi's own Kalshi Trading LLC fills that role.  So does Defendant Susquehanna.  These market makers enable prediction markets' illegal, unregulated gambling offerings by providing much-needed liquidity.  In exchange for the funds they provide, market makers receive various financial and non-financial kickbacks from Kalshi.  In practice, these market makers employ precisely the same business model as the sportsbooks this State has prohibited.  And they regularly profit at the expense of the State's residents.

4.      Recently, Defendants have come under sustained legal fire.  The Ohio Casino Control Commission recently issued cease-and-desist letters to Kalshi and Robinhood, warning

3

**2025 CV 01517**

them that "[p]urchasing a contract based on which team a person thinks will win a sporting event is no different than placing a bet through a traditional sportsbook." And it is just one of seven States—alongside Arizona, Illinois, Maryland, Montana, Nevada, and New Jersey—to send similar letters to prediction-market operators.

5.     That skepticism of Defendants' business model is widely shared. Legal commentators, sports executives, and lawful gambling companies have publicly expressed their view that Defendants' product constitutes illegal, unregulated gambling. And Kalshi itself admitted just last year—in a filing before the D.C. Circuit—that the sports-betting event contracts it offers are something Congress meant to prohibit. All this paints a grim future for Defendants' event-contract operations in the United States.

6.     Like many States, Ohio offers an additional safeguard against illegal, unregulated gambling: its Statute of Anne. Based on a 1710 British law passed during the reign of Queen Anne, that law allows a losing party to sue the winning party for the value of gambling losses plus fees. And should the losing party fail to sue within six months, the statute authorizes any third party to bring a claim against the winning party to recover those losses and fees also.

7.     Defendants have operated in Ohio without regard to the State's legal limits for years. Each year, they take tens of millions of dollars from Ohio gamblers. But under the State's Statute of Anne, each time Defendants caused a gambler in Ohio to suffer gambling losses, that person had the right to sue for recovery of those losses. And after six months, *any* person may sue for those losses on the victims' behalf. In filing this action, Plaintiff takes just that step.

## PARTIES

8.     Plaintiff Ohio Gambling Recovery LLC is a company formed under the laws of Delaware to enforce Ohio's gambling laws. Its mailing address is 1700 S MacDill Ave, Suite 300,

**2025 CV 01517**

Tampa, FL 33629. Plaintiff has no relationship to any gambler who has suffered gambling losses and has not colluded with any gamblers in bringing this action.

9.  Defendant Kalshi Inc. is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is the parent company of all other Kalshi entities (collectively "Kalshi"). Kalshi operates a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

10.  Defendant KalshiEX LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a commodities exchange. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

11.  Defendant Kalshi Klear Inc. is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a registered derivatives clearing organization. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

12.  Defendant Kalshi Klear LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a registered derivatives clearing organization. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

5

13.      Defendant Kalshi Trading LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a market maker for Kalshi's prediction market, buying and selling event contracts on the platform. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

14.      Defendant Susquehanna International Group LLP is a Delaware corporation headquartered at 401 City Avenue Suite 220, Bala Cynwyd, Pennsylvania 19004. On information and belief, it is the parent company of all Susquehanna entities (collectively, "Susquehanna"). As relevant, Susquehanna serves as a market maker for Kalshi, buying and selling event contracts on the platform.

15.      Defendant Susquehanna Government Products, LLLP is a foreign limited partnership incorporated in Delaware and headquartered at 80 State Street, Albany, New York 12207. On information and belief, it is a wholly owned subsidiary of Susquehanna International Group LLP and is one of several trading and investing entities within it. As relevant, Susquehanna Government Products, LLLP operates as an institutional market maker for Kalshi, buying and selling event contracts on the platform.

16.      Defendant Robinhood Markets, Inc. is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. On information and belief, it is the parent company of all other Robinhood entities (collectively, "Robinhood"). Robinhood is an investment platform that permits trading on stocks, ETFs, and other commodities. As relevant, it has partnered with Kalshi to open—on the Robinhood investment platform—a prediction market hub, allowing the

6

State's residents to place illegal, unregulated wagers in the form of event contracts. In concert with Kalshi, it helps operate a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

17. Defendant Robinhood Derivatives LLC is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. On information and belief, it is the wholly owned subsidiary of Robinhood Markets, Inc. It is a futures commission merchant and provides options on futures trading. As relevant, it is the component of Robinhood that has partnered with Kalshi to offer a prediction market hub, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts. In concert with Kalshi, it helps operate a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

18. Defendant Webull Corporation ("Webull") is a Cayman Island corporation headquartered at 200 Carillon Parkway Street, St. Petersburg, Florida 33716. It is a financial services holding company that provides an electronic trading platform of the same name. As relevant, Webull has partnered with Kalshi to offer a prediction market hub, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts. In concert with Kalshi, it helps operate a prediction market, allowing the State's residents to place illegal, unregulated wagers in the form of event contracts.

19. On information and belief, Defendants are each "winner[s]" at gaming within the meaning of the Statute of Anne, R.C. 3763.04. On information and belief, each regularly causes Ohio residents to suffer gambling losses.

## JURISDICTION AND VENUE

20. This case arises under R.C. 3763.04.

21.     This Court has jurisdiction over the subject matter of this case pursuant to R.C. 1901.18.

22.     This Court has personal jurisdiction over the Defendants under R.C. 2307.382. Each of the Defendants transacts substantial business in the State, has purposefully directed its activities at residents of the State, and has purposefully availed itself of the benefits of the State's laws.  Plaintiff is a Delaware resident and its claims against Defendants arise out of, relate to, and have a substantial connection with business purposefully transacted by Defendants in Ohio.

23.     Venue is proper in Ohio because, among other things, the conduct underlying Plaintiff's claims occurred in Ohio.

### STATEMENT OF THE FACTS

### I.     OHIO'S STATUTE OF ANNE ALLOWS PRIVATE PARTIES TO SUE FOR ILLEGAL GAMBLING.

24.     While the specific conduct animating this lawsuit is recent, the cause of action animating it is not.  It traces its roots to the twilight of the House of Stuart, when Queen Anne adopted what would become known as the Statute of Anne of 1710.  That law had two main elements. The first declared a wide range of gambling transactions void (in effect, freeing the losing party from any obligation to pay the winner).  The second created causes of action to claw back gambling gains.  Those who lost at least "the Sum or Value of ten Pounds" could sue the winner to recover the amount they lost, along "with Co[s]ts of Suit."  And should the losing party fail to initiate that recovery suit within three months without just cause, any other person could bring a suit against the winning party for treble damages.

25.     Ohio's own statute operates similarly in many respects.  It provides that "[i]f a person, by playing a game, or by a wager, loses to another, money or other thing of value … such

8

person losing and paying or delivering, within six months after such loss and payment or delivery, may sue for and recover such money or thing of value or part thereof, from the winner thereof, with costs of suit." R.C. 3763.03. And "[i]f a person losing money or thing of value, …within the time therein specified, and without collusion or deceit, does not sue, …*any person* may sue for and recover it, with costs of suit, against such winner, for the use of such person prosecuting such suit." R.C. 3763.04 (emphasis added).

26.     This statute sweeps broadly, as Ohio prohibits most gambling. Among other things, the State provides that "[n]o person shall … [e]stablish, promote, or operate or knowingly engage in conduct that facilitates any game of chance conducted for profit or any scheme of chance." R.C. 2915.02(A)(2). The State exempts from this definition certain "conduct in connection with gambling expressly permitted by law." R.C. 2915.02(C). But not much falls in that umbrella. Ohio operates a handful of brick-and-mortar casinos licensed by the Ohio Casino Control Commission. It also runs a state lottery, permits charity raffles, and allows for certain types of sports betting. But that is as far as the State will go.

27.     Defendants' event contracts flagrantly violate Ohio's gambling regulations. In filing this action, Plaintiff sues to recover the ill-gotten gains obtained by Defendants from those illegal, unregulated gambling offerings.

## II.     PREDICTION MARKETS VIOLATE OHIO LAW

28.     Unregulated gambling (including sports betting) is illegal in Ohio. But certain Defendants have disregarded that prohibition, operating "prediction markets" within the State. These markets enable the State's residents to purchase "event contracts"—illegal, unregulated wagers on future events. For example, Defendants allow the State's residents to wager on the outcome of an athletic competition, on the results of an election, and on whether a particular song

9

will break into the Billboard Top 100. These wagers are indistinguishable from those offered in casinos, sportsbooks, and other gambling establishments. And because these prediction markets serve as counterparties to each wager, shoulder the credit risk of their event contracts, and serve as their own market makers (facing off against the State's residents in the process), they are gambling "winners" for purposes of the State's Statute of Anne.

29.     These event contracts depend on the liquidity provided by institutional "market makers," which buy and sell event contracts.   Market makers operate using a model indistinguishable from the sportsbooks that the State expressly prohibits. And when the State's residents purchase event contracts on a prediction market, they almost always face off against money provided by a market maker on the other side of the ledger. In that way, market makers make it possible for the State's residents to place illegal, unregulated gambles "against the house." Notably, the leading prediction market nationwide, Kalshi, also market-makes on its own platform using a wholly owned subsidiary, Kalshi Trading LLC. And because Defendants Robinhood and Webull host Kalshi's prediction market on their own platforms, they too function as prediction markets and are liable under the Statute of Anne.

30.     Because Defendants' offerings are illegal, unregulated gambling products and because Defendants are individually and collectively the "winners" of gambling competitions played by the State's residents, Plaintiff may sue for the uncollected losses Defendants have inflicted on those residents within the statute of limitations period.

## A. PREDICTION MARKETS ALLOW GAMBLING ON THE OCCURRENCE (OR NON-OCCURRENCE) OF FUTURE EVENTS

31.     This litigation centers on "prediction markets," which allow for the purchase and sale of "event contracts." Event contracts are defined federally as "agreements, contracts,

transactions, or swaps in excluded commodities"—i.e., in commodities that do not have intrinsic cash value and that are not traded on a stock market— "that are based upon the occurrence, extent of an occurrence, or contingency," "other than a change in the price, rate, value, or levels of a commodity." 7 U.S.C. § 7a-2(c)(5)(C)(i). Put more simply, event contracts are futures contracts that pay out if some non-commodity-related future event does (or does not) occur.

32.     Founded in 2018, Defendant Kalshi operates one of the largest prediction markets in the United States. Since July 2021, it has enabled individuals in all 50 States (including Ohio) to gamble on a wide range of future events spanning a wide range of subject matters. For instance, as of the time of filing Kalshi offers wagers on whether the Oklahoma City Thunder will win the NBA championship series by a score of 4 games to 2; on whether Gavin Newsom will be the Democratic nominee for President in 2028; on whether Bruno Mars will have the most Spotify listeners at the end of June; on whether New York City will receive more than 4 inches of rainfall this month, and on whether the Pope will say President Trump's name before the end of September.

33.     Kalshi's event contracts share a common form. For each, Kalshi poses a question about some definite future event. For example, Kalshi may ask: "Will the Kansas City Chiefs win the next Superbowl?" It then presents users with two options: "Yes" or "No." Users can buy either option at some variable price (set by market forces), ranging from $0.01 to $0.99. When the "Yes" and "No" options combined add up to exactly $1, an "event contract" is formed. Then, the parties wait for an answer to the question (in the example above, whether the Kansas City Chiefs will win the next Superbowl). If the Chiefs win, then Kalshi will pay the bettors who voted "Yes" the value of the $1 contract, while the bettors who betted "No" will lose the money

11

wagered. If the Chiefs do not win, Kalshi will pay the bettors who voted "No" the value of the $1 contract, and the bettors who voted "Yes" will lose the money wagered.

34.     To make this model works, Kalshi permits trading (before a contract is finalized) of both "Yes" and "No" options. For example, if a user believes that the market is undervaluing the Chief's chances of winning the Superbowl, that party is incentivized to purchase "Yes" contracts, driving the "Yes" price up and the "No" price down. Similarly, if a party believes that the market is undervaluing the Chief's chances of *losing* the Superbowl, that party is incentivized to buy "No" contracts, driving the "No" price up and the "Yes" price down. In that way, the final prices of both the "Yes" and "No" options should theoretically correspond to the percentage chance the market gives of each outcome occurring. So if, for example, "Yes" votes on the Chiefs were valued at $0.44 and "No" votes were valued at $0.56 (adding up to exactly $1), the predictions market would give the Chiefs a 44% chance of winning and other teams a 56% chance of winning.

35.     Kalshi profits off this arrangement directly, by charging what it styles as a "transaction fee." But that is a misnomer, because Kalshi is not merely overseeing transactions between parties. Rather, when "Yes" and "No" options add up to $1.00, Kalshi enters simultaneous wagers against *both* sets of buyers. When the outcome is decided, it is Kalshi that will ultimately pay the winners. And so Kalshi itself bears the credit risk. So, for example, if users fraudulently purchased "Yes" options, Kalshi that would be on the hook for paying the "No" holders anyways. Additionally, Kalshi does not necessarily match gamblers up 1:1, and (as noted in Kalshi Klear's Rulebook) it does not disclose the identities of the parties wagering on the other side of the ledger. In that way, Kalshi is not merely (or even mainly) an intermediary between other

12

third-party bettors. Rather, it is, itself, part of "the house." And that point is only reinforced by the fact that Kalshi *also* acts as a market maker for its own platform, as discussed below.

36.    Indeed, Kalshi's business model closely resembles that of a traditional bookmaker. Ordinarily, bookmakers try to minimize risk by adjusting their betting lines to incentivize roughly equal investment on both sides of a wager. For example, if gamblers overwhelmingly bet in favor of the Kansas City Chiefs as a -400 favorite, sportsbooks could move the betting line on the Chiefs to make them a -450 or -500 favorite instead. This would reduce the profitability of betting on the Chiefs, incentivizing more gamblers to come in on the other side of the ledger. By adjusting betting lines in this way, bookmakers can "balance their books." This ensures that they minimize losses, no matter who wins on the football field. And over time, it ensures they turn a profit. That is because the betting lines they offer for and against a team or player always preserve an edge for the house. Put differently, a gambler betting an equal amount of money for and against the same bet at a sportsbook will *always* lose expected value. Kalshi merely takes this business model and takes it one step further. Rather than derisking its operation by *roughly* balancing the money on both sides of the ledger, Kalshi derisks its operation by algorithmically *equalizing* them in its clearinghouse.

37.    The fact that Kalshi does a better job reducing risk than a traditional sportsbook does not change the fact that it—for all practical purposes—operates as one. Just like a traditional sportsbook, Kalshi offers bets both for and against various future outcomes. Just like a traditional sportsbook, Kalshi seeks to minimize risk by adjusting betting lines to track users' betting patterns. And just like a traditional sportsbook, Kalshi makes a profit by building into its calculus a small, statistical edge for itself. That it calls that edge a "transaction fee" is of no factual or legal

13

significance. As the Maryland Lottery and Gaming Control Commission observed in its recent cease-and-desist letter to Kalshi: "The purchase of the [event] contract is indistinguishable from the act of placing a sports wager."

38. While Kalshi is the most prominent prediction market operating in the State, other companies have entered the space. In 2024, Defendant Robinhood experimented with offering its own event contracts, allowing users nationwide (including, on information and belief, the State) to gamble on the result of the then-upcoming presidential election. And in May 2025, Robinhood partnered with Kalshi to launch a "Prediction Markets Hub" within its app. This hub effectively allowed Robinhood users to buy and sell Kalshi event contracts without ever having to leave the Robinhood platform. Because Robinhood's event contracts are sourced by Kalshi, its Prediction Markets Hub is substantially identical to the prediction platform Kalshi offers on its own website. This platform is available to individuals in all 50 States, including Ohio.

39. Similarly, in February 2025, Webull partnered with Kalshi to launch an offering similar to Robinhood's Prediction Markets Hub. This offering allows Webull users to buy and sell Kalshi's event contracts using the Webull platform. Because those event contracts are sourced by Kalshi, the offerings are substantially identical to the ones Kalshi provides on its own website. This platform is available to individuals in all 50 States, including Ohio.

40. On information and belief, the State's residents have placed illegal, unregulated wagers (in the form of event contracts) on Kalshi's prediction market, both directly and through the prediction-market hubs offered by Robinhood and Webull, which are themselves powered by Kalshi). Many of those individuals have lost considerable sums and have failed to sue within six

**2025 CV 01517**

months.  Plaintiff may therefore sue to recover the money those Defendants have taken from the State's residents.

## B. MARKET MAKERS BOOKMAKE FOR PREDICTION MARKETS, PROVIDING VITAL LIQUIDITY

41.     For Kalshi to offer event contracts successfully, it needs sufficient liquidity.  That is where "market makers" come in.  Market makers help Kalshi set the probability of future events by buying event contracts they consider undervalued and by selling event contracts they consider overvalued.  These opposing market forces drive event-contract prices to an equilibrium reflecting all publicly available information.  In the process, they ensure there is enough price movement to set the "Yes" and "No" options for wagers exactly equal to $1.00—a requirement for forming a complete event contract.  Indeed, Kalshi's own website admits that market makers play a key role in propping up its predictions market.

42.     To understand how market makers work, consider this example:  Suppose you own a rare Ming Dynasty vase and want to know its value.  But suppose there are few buyers in your immediate area with both the funds and the interest to bid on it.  You could try to hold an auction to determine the vase's worth.  But because of the relatively illiquid market, you would likely get less than fair market value.  Instead, you could rely on the help of "market makers"—in this example, companies that regularly buy and sell similar antiquities.  Because they compete against each other to acquire and offload inventory, they are incentivized to offer competitive rates to both buyers and sellers.  As a result, you can use their pricing to approximate the true value of the vase.

43.     Market makers for event contracts work in much the same way.  As repeat players, they provide liquidity to the event-contracts market, increasing its efficiency and promoting informationally efficient pricing.  Sometimes, they can do so without taking on any financial risk.

2025 CV 01517

For example, suppose (as often happens on Kalshi) that the "Yes" and "No" contracts on a specific wager add up to over $1.00. Specifically, suppose the "Yes" contract trades at $0.60 and the "No" contract trades at $0.42. If the same market maker acts as a counterparty to 233 "Yes" contracts and to 238 "No" contracts, it will profit no matter who wins the wager. This represents what a recent letter to the CFTC described as a "riskless principal transaction."

44.     To chase additional profits, market makers sometimes choose to favor one side of the ledger, providing liquidity to the market but taking on balance-sheet risk. Should the market maker wager incorrectly, it risks losing its money. To minimize this risk, market makers employ dedicated research teams, proprietary statistical models, and superior data and software. These allow them to estimate future events with greater accuracy than any individual gambler could hope to match. Additionally, market makers benefit from their unique contractual and technological integration with prediction markets, which provide them "financial benefits, reduced fees, differing position limits, and enhanced access." These perks greatly reduce market makers' financial exposure. As a result, wagering against individual gamblers is almost all upside for them.

45.     Between these two sorts of wagers, market makers extract essentially all the potential arbitrage available on Kalshi and other prediction markets. This makes it nearly impossible for individual gamblers to profit by gambling on Kalshi over time—even without factoring in Kalshi's so-called "transaction fee." And empirical studies bear this out. They show that, among those participate in sports betting, only about 3% profit each year. The other 97% loses money. And even that 3% is often the result of survivorship bias—the fact that, given enough time, someone must win eventually. Studies similarly suggest that individual gamblers have no more luck betting on other uncertain future events, such as music, pop culture, or world events. And

Kalshi admits as much point. For instance, its founder and CEO, Tarek Mansour, once boasted that "Kalshi is already the most accurate forecast for federal interest rates."

46. In all relevant respects, the market makers here operate just like traditional sportsbooks. And that is unsurprising. Traditional sportsbooks are a *type* of market maker—one focused only on event contracts for sports-related events. Just like traditional sportsbooks, event-contract market makers can securing risk-free profits by arbitraging the "bid-ask spread"—that is, by capitalizing on the gap between buying prices and selling prices of certain wagers. Just like traditional sportsbooks, market makers are large institutional investors with large teams, sophisticated models, and extensive resources. Just like traditional sportsbooks, event-contract market makers enjoy privileged status as a result of their contractual and technological integration with the platform itself. And just like traditional sportsbooks, event-contract money makers will sometimes risk their own capital by committing it to one side of the ledger, putting them in direct competition with individual gamblers.

47. It does not change matters that wagers on Kalshi usually offers percentages, rather than traditional betting lines. This is simply a matter of nomenclature. If, for example, the Kansas City Chiefs were -400 favorites to win a game at a traditional sportsbook, they would also be (assuming sufficient market liquidity) 80% favorites to win on prediction markets like Kalshi. Those two figures—being a -400 favorite and having an 80% chance to win—are different mathematical ways of expressing the same probability. And indeed, at least one leading sports-betting website encourages gamblers to convert sportsbooks' betting lines into probabilities (like the ones Kalshi uses) to assist them in calculating expected value.

**2025 CV 01517**

48. Data on Kalshi's website indicate that market makers account for the great majority of the total spending on Kalshi's event contracts. It follows that when the State's residents place a wager on Kalshi, there is almost always a market maker on the other side of the leger. Thus, while Kalshi is in one sense the *direct* counterparty to every transaction on the platform (and therefore a "winner" of gamblers' money), market makers also function as a counterparty—regardless of whether they choose to assume balance-sheet risk. And because individual gamblers cannot match the knowledge, data analytics, and resources that market makers bring to bear, they lose expected value each time they purchase an event contract.

49. Prediction markets and market makers need not be separate entities. KalshiEX's rulebook acknowledges that Kalshi Trading LLC may be a member of the prediction market, meaning that it is able to place trades on individual wagers. And a recent article confirms that "Kalshi is also doing some of its own market making through a separate entity called Kalshi Trading." In other words, Kalshi does not merely own and operate a prediction platform. It *also* drives gambling on that platform by buying and selling its own inventory. In that way, Kalshi pits itself directly against individual users (including the State's residents). That is just one more respect in which Kalshi itself qualifies as a gambling "winner."

50. However, to provide added liquidity, Kalshi also partners with certain hand-selected third-party market makers. As Kalshi observes, its "market operates with the valuable support of a designated group of market makers," which "play a vital role in ensuring market fairness and orderliness." The most notable of these is Susquehanna, which in April 2024 became the first external institutional market maker on Kalshi. Despite being separate legal entities, market makers are not financially independent of Kalshi. Rather, they are its business partners.

2025 CV 01517

They contract directly with Kalshi to provide liquidity to its prediction market.  In exchange, they receive all sorts of financial and non-financial kickbacks.  In that way, all Defendants work in concert to make illegal, unregulated gambling available within the State.

51.     Kalshi's own website confirms this relationship with its market makers.  It acknowledges that "applicants undergo a thorough review process evaluating their financial resources, relevant experience, and overall business reputation," and "[o]nly those demonstrating exceptional qualifications are granted market maker status."  And it acknowledges that, as a reward for achieving that status, market makers receive benefits from Kalshi, "including but not limited to financial benefits, reduced fees, differing position limits, and enhanced access."  The general public cannot access these benefits.  And they provide market makers with a decided advantage when using Kalshi's platform, ensuring that they profit at the expense of the public.

52.     On information and belief, the State's residents have repeatedly placed illegal, unregulated wagers on event contracts directly supported by the liquidity provided by institutional market makers (including Kalshi Trading LLC and Susquehanna).  Because the State's residents' funds flowed directly to these market makers, they are "winners" for purposes of the Statute of Anne.  Plaintiff may therefore sue to recover the money they have taken from the State's residents.

## C. DEFENDANTS' CONDUCT IS ILLEGAL IN THE STATE

53.     Defendants' conduct is flatly illegal under State law.  As noted above, Ohio provides that "[n]o person shall … [e]stablish, promote, or operate or knowingly engage in conduct that facilitates any game of chance conducted for profit or any scheme of chance."  R.C. 2915.02(A)(2).  Defendants' event-contract offerings are paradigmatic games of chance.  As explained above, they operate using a model indistinguishable from the sportsbooks that Ohio has long prohibited.

**2025 CV 01517**

54.      The State has acknowledged as much.  On March 31, 2025, the Ohio Casino Control Commission ("OCCC") issued cease-and-desist letters to Kalshi and Robinhood.  In a public statement accompanying that letter, OCCC Executive Director Mathew Schuler noted that "[p]urchasing a contract based on which team a person thinks will win a sporting event is no different than placing a bet through a traditional sportsbook."  Indeed, he went on to note that "[t]he only difference is that these event contracts do not have the consumer protections required under Ohio law and are accessible to Ohioans under 21 years of age."  Ohio is not alone in reaching those conclusions.  It joins six other States—Arizona, Illinois, Maryland, Montana, Nevada, and New Jersey—that have issued cease-and-desist letters, including to Kalshi and Robinhood.

55.      Defendants' offerings are also prohibited under federal law.  The Wire Act imposes criminal penalties on any party that "engaged in the business of betting or wagering[,] knowingly uses a wire communication facility for the transmission in interstate or foreign commerce . . . of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers."  18 U.S.C. § 1084(a).  And the Office of Legal Counsel has interpreted it to prohibit all gambling-related transmissions, including those unrelated to sports betting.  *See* OLC, *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling* (Nov. 2, 2018).  This interpretation postdated the Supreme Court decision that limited the Professional and Amateur Sports Protection Act of 1992 ("PASPA"), 28 U.S.C. § 3701 *et seq. See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018).

56.      Defendants run afoul of the Wire Act by using a "wire communication facility"— here, the Internet—to send communications entitling the State's residents to "receive money" on the bets or wagers they place on Kalshi's platform.  And all Defendants routinely send

2025 CV 01517

communications through the wires containing "information assisting in the placing of bets or wagers." That language covers both the prediction markets themselves and the market makers that—by purchasing the "Yes" and "No" options on Kalshi—communicate information about the relative likelihood of each of those outcomes. Moreover, given the contractual and technological ties between Kalshi, Robinhood, Webull, and Susquehanna, those companies necessarily communicate event-contract-specific information to one another regularly using digital means. All that is illegal under federal law, as prominent legal commentators have recently noted.

57. Sports leagues have expressed their own concern with the emergence of event contracts. For example, Jonathan D. Nabavi, the National Football League's Vice President of Public Policy and Government Affairs, recently warned the CFTC that "[t]hese contracts would mimic sports betting but seemingly without the robust regulatory features that accompany regulated and legalized sports betting and which help to mitigate threats to the integrity of [the NFL's] contests." The National Basketball Association and Major League Baseball have publicly stated similar positions. Even other gambling companies have warned about Defendants' conduct. For example, Atlantic City's casino interests filed a brief observing that Kalshi is "presently violating the Wire Act."

58. Perhaps most damning, Kalshi *itself* acknowledged the illegality of some of its present offerings just over a year ago in federal court. In a brief submitted to the D.C. Circuit, Kalshi argued that "Congress did not want sports betting conducted on derivatives markets." Brief for Appellee KalshiEX LLC at 41, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024). It went on to acknowledge that such sports betting was "unlikely to serve *any* 'commercial or hedging interest.'" *Id.* at 45 (emphasis added). Yet Kalshi is now offering precisely what it

**2025 CV 01517**

concluded Congress wished not to permit. And Webull has similarly taken the view (despite partnering with Kalshi to offer event contracts on its platform) that sports event contracts are not lawful and should not be offered.

### D. DEFENDANTS CAUSE MASSIVE GAMBLING INJURY NATIONWIDE, INCLUDING TO THE STATE'S RESIDENTS

59.     Kalshi has exploded to become one of the largest gambling platforms in the United States. Within the first five months of offering sports contracts, per its own spokesperson, it traded "more than $1 billion" on "3.4 million sports propositions." Per that spokesperson, it has roughly two million users nationwide. And Kalshi prominently advertises—across its promotional materials—that it operates in all 50 States. On information and belief, many of those two million individuals reside within the State.

60.     Moreover, the individual bets placed on Kalshi are often significant. For example, Kalshi's founder, Tarek Mansour, disclosed that during the presidential election, the median bet size in the United States for Kamala Harris was $85, and the median bet size for Donald Trump was $58. Because over half of the bets placed nationwide exceeded both of those figures, and because the total amount wagered on the presidential election on Kalshi exceeded $85 million, the State's residents must have placed many bets above that threshold. And that is just one of many wagers Defendants have collectively featured.

61.     Robinhood's own event contracts offering, powered by Kalshi, features a similar scale. Ever since unveiling its new prediction market hub in May 2025, experts have predicted the company's annual revenue to increase by around $260 million. Early returns confirm that prediction. When Robinhood offered event contracts for the most recent presidential election, it notched over 500 million contracts traded in one week alone. Market analysts see Robinhood's

move as an effort to tap into a gambling industry that they predict—without legal intervention—could swell to $95.5 billion in value by 2035. Per its own internal records, Robinhood has over 11 million annual users scattered across the United States. On information and belief, Robinhood's prediction market hub has widespread usage, including among the State's residents. Under the terms of its agreement with Kalshi, Robinhood shares in Kalshi's "transaction fee" each time an event contract is purchased on its platform. It is therefore a "winner" for all the same reasons and in all the same ways that Kalshi is a "winner." And it acts in concert and in privity with Kalshi to secure Kalshi's winnings at the expense of individual gamblers.

62.     Webull's own prediction market hub, also powered by Kalshi, was unveiled in February 2025. It operates much as Robinhood's does. Webull boasts significant reach also, with over 23 million registered users worldwide and a revenue of over $117 million during the first quarter of 2025 alone. Webull is available in all 50 States, including Ohio. And on information and belief, Webull's prediction market hub has widespread usage, including among the State's residents. Under the terms of its agreement with Kalshi, Webull shares in Kalshi's "transaction fee" each time an event contract is purchased on its platform. It is therefore a "winner" for all the same reasons and in all the same ways that Kalshi is a "winner." And it acts in concert and in privity with Kalshi to secure Kalshi's winnings at the expense of individual gamblers.

63.     As noted above, Kalshi's event contracts (and the event contracts Robinhood and Webull offer through their partnerships with Kalshi) rely upon, and are propped up by, market makers. Kalshi's website notes that market makers trade on each of the company's covered products for some 98% of each 1-hour increment and "provid[e] constant liquidity." Because of their ubiquity, each time a resident of the State places a wager on Kalshi, it is overwhelmingly likely

23

that there is a market maker somewhere on the other side of the ledger. And as the State's residents lose money in the long run gambling on Kalshi, these market makers will regularly win large sums of money directly from those residents.

64.     Defendants' conduct is fueling a pandemic of gambling addiction. As one recent article noted, prediction markets like Kalshi and Robinhood "blur the already hazy line between betting and other financial activities," as "the ability to place one bet after another" on those platforms "encourages a hallmark behavior of problem gamblers—when deep in the red, instead of walking away, they bet bigger."

65.     Problem gambling is especially common among young sports bettors. Per one industry study, some 58% of 18- to 22-year-olds gamble on sports each year, with roughly 10% gambling on sports each week and 4% doing so daily. Sports gambling addictions can begin as early as age 10, and studies have found that between 4% and 8% suffer from problem gambling. In addition to their financial impact, those habits can take a severe emotional toll. Of problem gamblers who have sought out treatment, "between 22 and 81 percent . . . have been found to have suicidal ideations," and "between 7 and 30 percent of individuals have had suicide attempts."

### COUNT I
### (Claim under R.C. 3763.04)

66.     Plaintiff brings this count against all Defendants under R.C. 3763.04.

67.     Upon information and belief, thousands of individuals within Ohio have lost—and continue to lose—money by gambling using Defendants' platforms and have not sued to recover those losses within six months of payment to Defendants. The identity and precise number of such gamblers ("Gambling Victims") is within the unique possession of Defendants.

68.     Defendants qualify as gambling "winner[s]," within the meaning of R.C. 3763.04.

24

**2025 CV 01517**

69.     Plaintiff qualifies as a "person" authorized to sue for the recovery losses at gaming within the meaning of R.C. 3763.04. Plaintiff is not in "covin or collusion" with any of the Gambling Victims.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against Defendants and respectfully requests that the Court grant the following relief:

A.  Declaring that the Defendants are liable under Statute of Anne, R.C. 3763.04;

B.  Awarding eligible damages, continuing until the time of final judgment, based on the value of the money lost to Defendants at gambling;

C.  Awarding the costs of prosecuting this action, including reasonable attorney's fees, experts' fees, and litigation costs together with interest;

D.  Awarding pre- and post-judgment interest as allowed by law; and

E.  Granting such other relief as the Court deems proper.

**2025 CV 01517**

Dated:  June 11, 2025

Respectfully submitted,

*/s/* Benjamin M. Flowers
Benjamin M. Flowers (0095284)
ASHBROOK BYRNE KRESGE FLOWERS LLC
PO Box 8248
Cincinnati, OH 45249
Tel: (614) 705-6603
Fax: (513) 216-9882
bflowers@abkf.com


Derek T. Ho (*pro hac, forthcoming*)
Kyle B. Grigel (*pro hac, forthcoming*)
KELLOGG, HANSEN, TODD, FIGEL &
   FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
dho@kellogghansen.com
kgrigel@kellogghansen.com


*Counsel for Plaintiff*

2025 CV 01517

IF UNDELIVERABLE RETURN TO
MICHAEL P. CICCONE
Mahoning County Clerk of Courts
120 Market Street, Youngstown, Ohio 44503 1756

9414 7266 9904 2225 8059 53

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**®

FIRST-CLASS

2025 CV 01517
9414 7266 9904 2225 8059 53
ROBINHOOD DERIVATIVES LLC
85 WILLOW ROAD MENLO PARK
MENLO PARK, CA 94025



US POSTAGE ᴾᴵᵀᴺᴱʸ ᴮᴼᵂᴱˢ
ZIP 44503 $ 010.20°
02 7M
0008031327 JUN 23 2025